J-A10029-21
J-A10030-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: CAITLYN ROGOWSKI, | : | |
| MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2320 EDA 2020 |

Appeal from the Decree Entered November 3, 2020
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s):  7 OCA 2020

| | | |
|---|---|---|
| IN THE INTEREST OF: L.L., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: RICHARD LAWSON, | : | |
| FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2321 EDA 2020 |

Appeal from the Decree Entered November 3, 2020
In the Court of Common Pleas of Monroe County Juvenile Division at
No(s):  7 OCA 2020

BEFORE:   PANELLA, P.J., OLSON, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:                    **FILED JULY 20, 2021**

C.R. ("Mother") and R.L. ("Father") (collectively, "Parents"), appeal the

decree dated and entered on November 3, 2020, which granted the petition

filed by the Monroe County Children and Youth Services (hereinafter, "CYS"

_____

[*] Retired Senior Judge assigned to the Superior Court.

or the "Agency") to involuntarily terminate their parental rights with respect to their dependent, male child, L.L., (born in September of 2018) ("Child"), pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8), and (b), and changed the permanency goal for Child to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.[1]  We affirm.

On February 11, 2020, CYS filed a termination of parental rights ("TPR") petition seeking the involuntary termination of Parents' rights to Child.  On October 21, 2020, the trial court held an evidentiary hearing on the petition, at which Attorney Elizabeth Weekes represented CYS.[2]  Parents were present, along with their counsel, Attorney Ashley A. Messoline.  Child's guardian *ad litem* ("GAL")/legal interest counsel, Brandie J. Belanger, was also present on

---

[1] In the same decree, dated and entered on November 3, 2020, the trial court involuntarily terminated both Parents' parental rights to Child pursuant to 23 Pa.C.S. §§ 2511(a)(2), (5), (8), and (b), and changed the permanency goal for Child to adoption.  We dispose of both Parents' separate appeals from the decree terminating their parental rights and from the goal change order in a single memorandum for ease of disposition, as the trial court entered only one decree and filed an identical opinion in each case, essentially disposing of them together.  Notably, as the court changed Child's goal in the termination decree that Parents have appealed, not in a separate order, we find this matter distinguishable from *In the Interest of S.D.*, 2021 WL 2521629 (filed June 21, 2021), in that there was not a separate goal change order for Parents to appeal, and they are not challenging the goal change in any event.

[2] The trial court explained that, due to the COVID-19 pandemic and [c]ourt protocols, and the availability of counsel, the trial court continued the matter to October 21, 2020.  Trial Court Opinion, 11/3/20, at 1.

behalf of Child.[3]  CYS presented the testimony of its caseworker, Jennifer

Payne, who is assigned to the family.  N.T., 10/21/20, at 6.  Mother then

testified on her own behalf, as did Father.  *Id.* at 67, 86.

Based upon the testimonial and documentary evidence entered into the

record, the trial court made the following findings of fact regarding the period

preceding Child's birth.

1. [L.L.], DOB [September 2018] and two (2) years of age, is the minor child subject to the TPR petition.

2. [C.R.] ("Mother"), age 32, is the natural mother of the minor child[,] and she resides in East Stroudsburg, Monroe County, PA.

3. [R.L.] ("Father"), age 37, is the natural father of the minor child[,] and he resides with Mother in East Stroudsburg, Monroe County, PA.

4. The initial involvement by CYS with Mother and Father occurred in July 2015, when an older child, [P.], was born.  That child was born positive for opioids.  Other concerns included Mother having her parental rights terminated in New Jersey as to four (4) other children (three (3) voluntarily and one (1) involuntarily), and unstable housing.

5. Mother gave birth shortly thereafter to another child, [E.], and the same concerns still existed.  Both children were found dependent, with continued placement in the home.

6. Both [P.] and [E.] went into foster care in November 2016 due to [parental loss of housing].  The [P]arents then moved to New Jersey, where an Interstate Compact [on the Placement of

_____

[3] On February 14, 2020, the trial court appointed Attorney Belanger as Child's GAL/legal interest counsel.  *See* Trial Court Order, 2/14/20.

Children, ("ICPC"),] was denied due to unstable housing and Father being incarcerated for a period of time.

7. Mother and Father had no contact with [P.] and [E.] from November 2016 until July 2018[,] when [Parents] returned to Pennsylvania.

8. Visit coaching with Justice Works was then put in place.

Trial Court Opinion, 11/3/20, at 1-2.

Based upon the testimonial and documentary evidence entered into the record, the trial court made the following findings regarding the facts which lead CYS to file a dependency petition regarding Child.

9. On September [ ], 2018, [Child] was born positive for Suboxone, which Mother was reportedly taking. It was later revealed that Mother had been receiving Suboxone treatment since at least July 2015[,] when CYS first became involved with the family.

10. The minor child then went through withdrawal and had to be placed in the NICU [Neo-Natal Intensive Care Unit] at the hospital.

11. EPC [Emergency Protective Custody] was taken and shelter care was granted on October 2, 2018[,][ ] due to housing, the minor child's withdrawal symptoms, and no progress on the [P]arents' goals for the two older children.

12. As of October 2018, Mother and Father were living in a one[-]room rental at the Paramount Motel in East Stroudsburg, PA.

13. At that time, Father was refusing drug screens and Mother refused to sign releases of information for CYS.

Trial Court Opinion, 11/3/20, at 2-3 (footnote omitted).

Based upon the testimonial and documentary evidence in the record, the trial court made the following findings regarding Child's dependency.

- 4 -

14. Dependency of the minor child was granted by [the trial court on October 11, 2018,[4]] shortly after shelter care, and placement was ordered to be with the [P]arents after the minor child was released from the NICU, provided drug and alcohol screens were given, no smoking in the home, and that the [P]arents sign releases for CYS. [**See** N.T., 10/21/20, at 14]. The [c]ourt also found aggravated circumstances existed due to Mother's TPR of her older children in New Jersey.

15. Mother again refused to sign releases[,] and both Mother and Father refused drug and alcohol screens, which resulted in the minor child going from the NICU to a foster home, instead of home with the [P]arents.

Trial Court Opinion, 11/3/20, at 3.

The trial court made the following findings of fact regarding the period extending from Child's adjudication of dependency until CYS filed the TPR petition in this case.

16. Despite Mother not signing releases or providing medical records, CYS was able to confirm that Mother was treating with a doctor for opioid dependency and that Mother had been taking Suboxone for four years at that point. CYS was concerned because Mother would not admit that her Suboxone use was for an opioid dependency and she would not provide information on her treatment.

17. A TPR petition was filed as to the older children [P.] and [E.], and[,] on January 23, 2019, the parental rights of Mother and Father as to those children were terminated. (**See** 54 and 55 OCA

_____

[4] The notes of testimony from the hearing on October 21, 2020 appear to have a typographical error, as it states that Child was adjudicated as dependent on October 21, 2019, but the trial court states in its opinion that the court adjudicated Child dependent on October 11, 2018, which appears to be the correct date based on the record. **See** Trial Court Opinion, 11/3/20, at 17; **cf.** N.T., 10/21/20, at 14.

2018). The TPRs were upheld by the Superior Court by order entered on November 11, 2019 at No. 634 E.D.A. 2019, which became final thereafter. The older children were then adopted by their foster parents on October 20, 2020.

18. Father became verbally abusive with the CYS caseworker after entry of the TPR on the two older children, including incidents where he called her a kidnapper, was loud and angry, and slammed a door in her face.

19. Mother and Father continued visits with the minor child at CYS, and then again at Justice Works when visits were moved there in the summer of 2019.

20. The concerns at that time were still housing, Mother's continued use of Suboxone with a prior opioid addiction, lack of consistent drug screens from Father, [P]arents' excessive smoking[,] and the abusive language and anger of Father toward CYS caseworkers.

21. Following a review hearing in 2019, Father made threats of punching the caseworker.

22. During the visits at Justice Works, the [P]arents smelled of cigarette smoke and took excessive smoking breaks. Father also brought a knife to one of the visits.

23. In the fall of 2019, Mother and Father moved to a two[-]bedroom apartment [in] East Stroudsburg, PA[,] where they continue to reside to the present time. The apartment is on the same property with a motel located thereon.

24. In January 2020, the caseworker again discussed with Mother about having a mental health evaluation done. Mother has never provided one or supplied records on her mental health. Also at that time, Father stated he was working at a restaurant in Tannersville, PA, but provided no proof of employment.

25. Mother has been giving drug screens to Justice Works at visits and has remained positive for Suboxone.

26. A home visit was conducted on January 16, 2020. It had to be scheduled at a [c]ourt hearing due to the [P]arents' refusal to respond to the caseworker's earlier requests to see the home. The [P]arents still have not provided a lease for the residence despite numerous requests to do so.

27. The home was appropriate, [sic] but smelled heavily of cigarette use. It is also noted that the [P]arents had an overwhelming smell of cigarette smoke on them in [c]ourt at the hearing held on October 21, 2020.

Trial Court Opinion, 11/3/20, at 3-5 (footnote omitted).

The trial court made the following findings of fact regarding the Parents' conduct during the period following CYS's filing of the TPR petition on February 11, 2020.

28. Mother and Father have submitted no proof of employment nor any paystubs despite numerous requests by CYS. Both parents were unemployed at the time of the hearing in this matter, [sic] but claim to receive about $450 per week in unemployment benefits. Their rent is $400 per week. Mother says she gets some financial help from her stepfather.

29. The [P]arents do not have reliable transportation[,] as their car broke down. As a result, they have been having virtual visits with the minor child since August 2020 by Zoom. The [P]arents claim they will be getting the car fixed with the help of [Child's paternal grandfather].

30. Father has remained verbally abusive toward CYS by making comments and swearing in the background of the Zoom visits.

31. Mother has not provided any drug and alcohol records other than confirmation she has been taking Suboxone. Mother claims she had a drug and alcohol evaluation through Catholic Social Services, but CYS did not have a record of it.

32. Mother does not appear to have engaged in any drug and alcohol counseling other than continuing to take Suboxone.

Mother stated she is trying to reduce the amount of Suboxone she takes daily in an attempt to no longer use it. Mother denies any impairment from the use of the Suboxone.

33. Mother claims she suffers from anxiety and that she had a mental health evaluation done. However, she could not remember the name of the doctor and she has not provided any information about it to CYS.

34. Mother stated she completed parenting classes in the past, but Father did not due to his incarceration in New Jersey.

35. Mother has had eight (8) total children, of which six (6) have had parental rights terminated, (1) is deceased and the other is the minor child in this case.

36. The [P]arents' unemployment benefits will run out in December 2020, and Mother admitted they have not really looked for employment due to the COVID-19 pandemic, as she believes no one is hiring.

37. Father stated that he refuses drug screens because he believes there was a false positive for alcohol in a past screen.

Trial Court Opinion, 11/3/20, at 5-6.

The trial court made the following findings of fact regarding Child's

relationship with the Parents.

38. The visits with the minor child show a good parent/child relationship. The [P]arents have also brought snacks and toys to the visits for the minor child.

39. The [P]arents have a bond with the minor child as his parents.

40. The minor child lives in the same foster home with his two siblings, [P.] and [E.].

41. The minor child has as strong bond with his siblings and with the foster parents.

42. The foster parents want to adopt the minor child and have already adopted his two older siblings.

43. The minor child's attorney agrees with the request for TPR.

44. CYS is also seeking a goal change to adoption.

Trial Court Opinion, 11/3/20, at 6-7 (footnote in original).

In a decree dated and entered on November 3, 2020, the trial court terminated Mother's and Father's parental rights to Child, pursuant to 23 Pa.C.S. § 2511(a)(2), (5), (8), and (b), and changed Child's permanency goal to adoption, pursuant to 42 Pa.C.S. § 6351. On December 1, 2020, Mother and Father each timely filed a notice of appeal, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

In their briefs on appeal, Mother and Father raise one identical issue:

1. Whether the court erred in finding that [CYS] proved the elements of 23 Pa.C.S.A. section 2511(a)(2), (5) and (8) and 23 Pa.C.S.A. section 2511 (b) through clear and convincing evidence.

Mother's Brief at 4; Father's Brief at 4.[5]

---

[5] Mother and Father waived any challenge to the goal change by their failure to preserve the challenge in their concise statements and statements of questions involved on appeal. *See Krebs v. United Refining Company of Pennsylvania*, 893 A.2d 776, 797 (Pa. Super. 2006) (stating that any issue not set forth in or suggested by an appellate brief's statement of questions involved is deemed waived). *See also In re W.H.*, 25 A.3d 330, 339 n.3 (Pa. Super. 2011); *In re M.Z.T.M.W.*, 163 A.3d 462, 465-66 (Pa. Super. 2017).

Mother and Father argue that CYS failed to establish by clear and convincing evidence that it satisfied the statutory grounds for termination under Pa.C.S.A. § 2511(a)(2), (5) and (8), and (b). Mother and Father contend that the evidence was insufficient to support a decision to terminate their parental rights, and that the trial court failed to properly consider that they had remedied the original reasons for Child's placement in foster care. They also assert that the evidence was insufficient for the trial court to conclude that termination of their parental rights was in the best interest of Child. Accordingly, they urge that the trial court committed an error of law and abuse of its discretion. Mother's Brief at 8; Father's Brief at 8.

In reviewing an appeal from a decree terminating parental rights, we adhere to the following standard:

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, 608 Pa. 9, 9 A.3d 1179, 1190 (Pa. 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *R.I.S.*, [614 Pa. 275, 284,] 36 A.3d 567, 572 (Pa. 2011) (plurality opinion)]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.*, 613 Pa. 371[, 455], 34 A.3d 1, 51 (Pa. 2011); *Christianson v. Ely*, [575 Pa. 647, 654-655], 838 A.2d 630, 634 (Pa. 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*

> As we discussed in **R.J.T.**, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. **R.J.T.**, [608 Pa. at 28-30], 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. **In re Adoption of Atencio**, [539 Pa. 161, 165,] 650 A.2d 1064, 1066 (Pa. 1994).

**In re Adoption of S.P.**, 616 Pa. 309, 325-26, 47 A.3d 817, 826-27 (2012).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. **In re R.N.J.**, 985 A.2d 273, 276 (Pa. Super. 2009).

Moreover, we have explained, "[t]he standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." **Id.**, *quoting* **In re J.L.C.**, 837 A.2d 1247, 1251 (Pa. Super. 2003).

This Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of section 2511(a). **See**

*In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  We will

address section 2511(a)(2) and (b), which provides as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party

must produce clear and convincing evidence regarding the following elements:

(1) repeated and continued incapacity, abuse, neglect or refusal; (2) such

incapacity, abuse, neglect or refusal caused the child to be without essential

parental care, control or subsistence necessary for his physical or mental well-

being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. ***See In re Adoption of M.E.P.***, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa. Super. 2002).

This Court has stated that the focus in terminating parental rights under section 2511(a) is on the parent, but it is on the child pursuant to section 2511(b). ***See In re Adoption of C.L.G.***, 956 A.2d 999, 1008 (Pa. Super. 2008) (*en banc*).

Regarding section 2511(a)(2), Mother and Father argue:

Of significant importance in the instant case, [sic] is that none of the conditions that led to placement continued to exist at the time of filing for termination, and there is in no way a refusal or incapacity by the [P]arents to perform parental duties. The caseworker gave a vague answer when identifying the initial concerns saying, "two other children being in foster care. . . and [Parents'] current living arrangements at that time." N.T. 10/21/2020 at 11. Despite these concerns, however, the minor child did return home with [P]arents.

The caseworker then harped on the fact that [M]other did not provide her medical records to the Agency. However, [M]other did in fact provide records in a sense, and the Agency admits to having received a letter, email, and phone call from [M]other's treating physician. The caseworker testified that this correspondence documented that natural mother was under the care of a physician, had a valid prescription for suboxone, [M]other was compliant with treatment, and that her drug screens

for her treating physician were always fine. *Id*[*.*] at 15. The caseworker admitted she had no reason to question the prescribing doctor or that [M]other was compliant with treatment saying, "I do trust what he's saying in the letter, yes." *Id*[*.*] at 40. The caseworker further admitted that she was in no way a medical professional qualified to decipher medical records. Yet she still insisted on reading medical records of natural mother in an attempt to somehow insert her lay opinion about [M]other's [S]uboxone use.

Also of importance in relation to the Agency's concerns about drug use are [M]other's screens for the Agency as well as the drug and alcohol evaluation from Catholic Social Services that confirmed no treatment was necessary. Except for a couple positive screens for marijuana in 2019, [M]other tested clean throughout 2020 and provided consistent screens up until the time of the visits being moved to [Z]oom. *Id*[*.*] at 43. Mother was never asked to participate in any type of counseling for drug and alcohol and never tested positive for an illegal opioid over almost two years of testing. The caseworker not being able to read medical records she isn't qualified to decipher does not rise to the level of a legitimate concern of an opioid addiction interfering with [M]other's ability to care for her son. If caseworkers are allowed to substitute their opinions for professionals trained to address drug and alcohol concerns, there's no use in requiring parents to engage in services in the first place.

Another concern identified by the Agency was the [P]arents' housing. However, the caseworker testified that [P]arents obtained a two-bedroom apartment that was appropriate for the child. Even when the [P]arents resided in a hotel, the caseworker noted that it was still acceptable and appropriate for the child. Although the [P]arents were not currently working at the time of the hearing, they had taken appropriate steps to maintain their apartment like many other Americans by filing for unemployment and seeking employment to the best of their ability during the pandemic.

Finally, the [P]arents in this case in no way showed a refusal or incapacity to parent as required under section 2511(a)(2). The [P]arents actively participated in visitation, and visitation was appropriate and positive. The [P]arents provided items for the

child including meals and toys, and also maintained items for the child within their home. They also demonstrated that reasons for placement were in fact remedied as discussed at length above.

Natural mother's testimony was credible and convincing and established that the [P]arents did address the Agency's concerns and reasons for placement to the best of their ability. The caseworker's testimony was vague and often times contradictory in regards to the drug and alcohol concerns and evaluation. Although there is no dispute that the first prong under 23 Pa.C.S.A. § 2511(a)(5) and (8) is met, the Agency did not establish by clear and convincing evidence that the conditions that led to placement still exist[,] nor did it prove by clear and convincing evidence that any prongs under [§] 2511(a)(2) have been met. The record and testimony are not enough to support the [t]rial [c]ourt's decision.

Mother's Brief, at 11-13; Father's Brief, at 11-13.

The trial court addressed the Parents' issue regarding 23 Pa.C.S.

§ 2511(a)(2), as follows:

[]The minor child has been in care since he was born over two years ago[.]

We [ ] find that CYS has provided clear and convincing evidence for granting the requested TPR. In this case, the minor child has been removed from the [P]arents' care more than one (1) year. The minor child has resided in the same foster home for his entire two[-]year lifetime. The conditions that led to removal continue to exist, in that the [P]arents have no employment [and] they lack transportation. Mother continues to take Suboxone without providing a current drug and alcohol evaluation or proof of a mental health evaluation, Mother has not released her medical records or signed a release, Father refuses to give drug screens and has not completed parenting classes, and questions remain as to the stability of the [P]arents.

The [P]arents claim they have or will have transportation, but their vehicle has not worked in over three months. Due to this, visits have been by video, since they cannot get to Justice Works

- 15 -

to see the minor child. The [P]arents claim it will be fixed soon. But, [sic] their only income is unemployment benefits of $450.00 per week and their rent alone is $400.00 per week. The [P]arents claim the minor child's paternal grandfather will pay to have the vehicle fixed, [sic] but offer no proof of that or why it was not done sooner. It is unknown when the [P]arents will have transportation again.

The [P]arents claim to be able to support themselves and the minor child; however, they provide no proof of employment. Father claims he has had all "cash" jobs in the restaurant business, which ended due to COVID-19. Assuming the [P]arents receive unemployment benefits as they stated, the weekly amount barely covers their rent with only a few hundred dollars per month left over for food, clothes, utilities, and transportation. They clearly smoke a lot of cigarettes, which can be expensive. Their unemployment benefits run out in December 2020 and neither parent has actively sought out work, which they claim generally is due to the COVID-19 pandemic. Mother claims her stepfather helps them with expenses, but she provided no proof of that, or even how much. It simply does not appear that the [P]arents can support themselves, let alone the minor child. This situation is concerning when considering the history of this case and that of the [P]arents' older children.

The [P]arents now live in a suitable residence[;] however, they provided no proof of a lease to confirm stability at that address. Housing was a primary concern when the minor child came into care. The lack of employment and high cost of this residence ($400.00 per week) causes questions about the ability of the parents to maintain it. The residence is also on the same property as a motel, which raises separate concerns about a transient population. The location of the residence also makes it difficult, if not impossible, for the [P]arents to attend visits because they do not have an operable vehicle.

Mother's prior drug use and her continued use of Suboxone was a concern when the minor child first went into care. Mother had been on Suboxone for several years at that point, two other children were born previously with opioid withdrawal, and the minor child suffered from withdrawal after birth due to Mother's continued Suboxone use. That use continues to the present time.

The concern is not that the Suboxone impairs Mother, rather it is her continued choice of this treatment for an opioid addiction without actually addressing her dependence on drugs. Mother refuses to sign a release for CYS to get her medical records to assess her prior drug and alcohol treatment. She has not provided proof of a recent drug and alcohol evaluation and does not appear to have received any drug and alcohol treatment. The continued use of Suboxone for over five years is like a "crutch" for treating Mother's opioid addiction, rather than treating the cause and ending an addiction. Counseling and tapering off of the Suboxone is what CYS was looking for; otherwise, there is a concern that a missed dose, or some other circumstance, could lead to a relapse of opioid use. Mother says she can take one less pill each day when she needs to do so. However, she misses the point of the CYS goal[,] which is to eliminate her dependence on something in order to lessen her chance of a relapse.

Mother has also failed to obtain and provide a mental health evaluation to CYS for her noted anxiety issues. Mother has continuously refused to provide CYS with her medical records or sign a release for records. This dates back to this [c]ourt requiring her to do so in order to have the minor child placed in the home following the initial dependency hearing. Mother refused to follow that court order and the minor child was placed in foster care as a result. Despite that fact, Mother has still failed and refused to provide her medical records, or a release for those records. Mother claims she had a mental health evaluation done at some point, but she cannot remember the provider, when she did it, or what the recommendation was from it. Based upon that, we doubt Mother had an evaluation done and do not find her credible in that regard. Her failure to provide her medical records, or to sign a release, or to engage in a mental health evaluation is troubling at this point.

Father has not completed parenting classes, refuses to give drug and alcohol screens, and has failed to provide proof of employment despite various requests [by CYS throughout this case] to do so. His reason for failing to complete parenting classes was that he was incarcerated with only a week of classes left. However, that was several years ago, before the minor child was even born, and Father [has] done nothing since. He refuses to give drug screens because he believes CYS recorded a false

positive in the past.  However, he presented no proof of that, has been offered to give them at Justice Works instead, and he has not done them there or through any other third party of his choosing.

Father has never produced proof of employment.  He claims he has always received cash payment for work, but other than supplying the name of the [] restaurant where he recently worked, Father provided no details for CYS to be able to confirm prior employment.  Father is currently unemployed, which is somewhat understandable during the current global pandemic, but his unemployment runs out in less than two (2) months and he has not offered any plan.  It is also concerning that Father has blamed the TPR of his older children on the CYS caseworker, and that he has remained belligerent and threatening to CYS caseworkers, both in person with them, and during video visits throughout the dependency of the minor child.  Father clearly has either mental health or anger management issues which need to be addressed.

[U]nder Section 2511(a)(2), parents are required to make diligent efforts toward reasonably prompt assumption of full parental responsibility.  ***In re A.L.D.***, 797 A.2d 326 (Pa. Super. 2002).  In two years, the parents have not remedied these conditions, other than moving to a two[-]bedroom apartment.  It also does not seem likely that the parents will remedy the conditions in a reasonable period of time.  Mother continues to use Suboxone, she will not provide medical records, she has not provided proof of a drug and alcohol evaluation or mental health evaluation, and she refuses to sign a release of information.  Mother and Father remain unemployed[,] and benefits run out soon.  Their income does not cover expenses and they have no transportation.  Father refuses to engage and complete parenting classes and refuses to give drug and alcohol screens.  The behavior of the [P]arents in the past and their current testimony did nothing to reassure the [c]ourt they will complete any of these things in the near future.  As such, the conditions that led to removal mostly still exist two years later with no assurance it will be addressed in a reasonable amount of time.

Trial Court Opinion, 11/3/20, at 11-16.

After a careful review, we find that the trial court's determination that CYS satisfied the requirements of section 2511(a)(2) is supported by competent, clear and convincing evidence in the record. *In re Adoption of S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27; *In re: T.S.M.*, 620 Pa. at 628-629, 71 A.3d at 267. We adopt the discussion set forth in the trial court opinion. There was sufficient evidence in the record from which the trial court could have properly found that the Parents display parental incapacities that have caused Child to be without essential parental care, control or subsistence necessary for his physical or mental well-being, as they lack stability, and that they cannot or will not remedy the causes of their incapacities, the conditions that led to Child's placement. The evidence showed that the same conditions that existed at Child's birth existed at the time that their parental rights were terminated with regard to Child's two older siblings, P. and E., and continued to exist at the time of the TPR hearing as to Child.

Regarding section 2511(b), Mother and Father argue that the trial court erred in finding that CYS proved that termination was in Child's best interest, citing *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). The Parents argue that they had regular visits with Child throughout the life of the case, and that Child shares a good bond with them, refers to them as his mom and dad, and runs to them in excitement when seeing them at visits. Mother's Brief at 14, and Father's Brief at 14, *citing* N.T. 10/21/2020 at 49, 53, and 76-78. The

Parents also assert that the Justice Works notes CYS presented as CYS Exhibit 7 support the conclusion that Child had positive visits with them, and that Child's pre-adoptive foster parents did not note any concerns with the visits between the Parents and Child when they facilitated the visits via Zoom. Mother's Brief at 14; Father's Brief at 14. The Parents urge:

> While [C]hild is placed with his siblings in his foster home, there was no testimony or evidence to suggest that severing the bond of the [C]hild and [P]arents would not be more detrimental than beneficial to the child. [Child] and [P]arents clearly love each other and [P]arents are in a position to care for their son.

Mother's Brief at 15; Father's Brief at 15.

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court has stated as follows.

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012). In *In re E.M.*, [533 Pa. 115, 121, 620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791.

*In re: T.S.M.*, 620 Pa. 602, 628-629, 71 A.3d 251, 267 (2013).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as

- 20 -

well. Additionally, section 2511(b) does not require a formal bonding evaluation." ***In re Z.P.,*** 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted). Although it is often wise to have a bonding evaluation and make it part of the certified record, "[t]here are some instances . . . where direct observation of the interaction between the parent and the child is not necessary and may even be detrimental to the child." ***In re K.Z.S.***, 946 A.2d 753, 762 (Pa. Super. 2008).

> A parent's abuse and neglect are likewise a relevant part of this analysis:

> concluding a child has a beneficial bond with a parent simply because the child harbors affection for the parent is not only dangerous, it is logically unsound. If a child's feelings were the dispositive factor in the bonding analysis, the analysis would be reduced to an exercise in semantics as it is the rare child who, after being subject to neglect and abuse, is able to sift through the emotional wreckage and completely disavow a parent . . . Nor are we of the opinion that the biological connection between [the parent] and the children is sufficient in of itself, or when considered in connection with a child's feeling toward a parent, to establish a *de facto* beneficial bond exists. The psychological aspect of parenthood is more important in terms of the development of the child and [his or her] mental and emotional health than the coincidence of biological or natural parenthood.

***In re K.K.R.-S.***, 958 A.2d 529, 535 (Pa. Super. 2008) (internal citations and quotation marks omitted). Thus, the court may emphasize the safety needs of the child. ***See In re K.Z.S.***, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of . . . her child

is converted, upon the failure to fulfill . . . her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." ***In re B.,N.M.***, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

This Court has explained that a parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights. ***In re Z.P.***, 994 A.2d at 1121. It is well-settled that "we will not toll the well-being and permanency of [a child] indefinitely." ***In re Adoption of C.L.G.***, 956 A.2d at 1007 (citing ***In re Z.S.W.***, 946 A.2d 726, 732 (Pa. Super. 2008) (noting that a child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting.")).

The trial court discussed Parents' argument concerning section 2511(b) as follows:

> Finally, an analysis of the minor child's needs and welfare . . ., as well as developmental, emotional and physical needs of the minor child under Section 2511(b), weighs in favor of terminating parental rights. The minor child is now two years old and has been in foster care all of his life. He needs stability and permanency. The minor child should not have to wait a long time to see if the [P]arents can address goals of the family service plan and concerns that still exist. The [P]arents still do not have stability, as the same concerns and problems exist today as they did at the minor child's birth, and at the TPR of the two older children. In contrast, the foster home is providing a stable home with no concerns.
>
> The foster family wants to adopt the minor child as they have with the two older children. The minor child is bonded with the foster parents, and with his siblings. Those siblings are now a

permanent part of the minor child's foster family. By granting the TPR, the minor child would remain with his siblings and his foster family permanently. This is of greater importance than if the minor child were simply with a different family and had no siblings. Furthermore, his young age, and need for continuity and recognition of parental providers is extremely important. To remove him at some point in the future to live with his parents, when that time is uncertain, would be very difficult for the minor child. He would also lose that connection, bond and comfort that he has with his siblings and foster family. He has only ever known a home with his foster parents and his siblings. As such, it is important that the minor child continue living in the foster home with his siblings.

The [P]arents do have a bond with the minor child. They have stayed connected with the minor child and attend visits regularly. The [P]arents are appropriate with the minor child and play with him at visits. The CYS caseworker has observed this as well. The [P]arents do appear to love the minor child and sincerely want to be a part of his life. However, a great deal of time has passed, and the [P]arents still have not addressed concerns, even with the ability to do so. The uncertainty of their income, employment, housing expenses, transportation, drug and alcohol issues and mental health have not been resolved[,] and it appears will not be resolved in a reasonable period of time based upon the [P]arents' actions. The minor child should not have to wait indefinitely for the [P]arents to address these issues. The minor child's placement with the foster family and his siblings weighs most heavily in favor of granting TPR. It has been shown that the welfare and needs, as well as the developmental, emotional and physical needs of the minor child will be best served by granting a termination. For all of these reasons, under Section 2511(a)(2), (a)(5), (a)(8) and (b), we will grant the petition of CYS.

* * *

[ ] Termination of parental rights of the mother and father would best serve the needs and welfare of [Child], and the statutory criteria set forth in 23 Pa.C.S.A. 2511(a)(2) and (b) for such termination has been established by clear and convincing evidence.

- 23 -

Trial Court Opinion, 11/3/20, at 16-17.

After a careful review, we find that the trial court's determination that CYS satisfied the requirements of section 2511(b) is supported by competent evidence in the record. *In re Adoption of S.P.*, 616 Pa. at 325-26, 47 A.3d at 826-27; *In re: T.S.M.*, 620 Pa. at 628-629, 71 A.3d at 267. We adopt the discussion set forth in the trial court opinion. The trial court gave proper consideration to Child's placement with his two older siblings, P. and E., in a pre-adoptive family who had adopted P. and E., and Child's connection and a bond with his siblings and foster family, which have provided him with permanence. While the Child may be bonded with the Parents, Child is also bonded with his foster parents, who have been constant and provided stability for Child in his young life. The trial court found that the Parents' bond with Child is not more significant than the fact that they have had a parental incapacity, and an inability or unwillingness to remedy their instability and incapacity to provide proper parenting for Child. We agree that the termination of the Parents' parental rights to Child, and his adoption by the same foster parents who adopted his siblings, P. and E., best serves his developmental, physical, and emotional needs and welfare.

As we have determined that there was clear and convincing evidence to support the termination of Mother's and Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(2) and (b), we find that the trial court did not commit an error of law or an abuse of discretion in terminating their

parental rights to the Child. Accordingly, we affirm the trial court decree.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/20/2021